# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO J. ALEGRE, | 1:09-cv-01135-OWW-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| JAMES D. HARTLEY, | [Doc. 1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a Petition For Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND[1]

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) following his 1993 conviction for first-degree murder. Petitioner is serving a sentence of twenty-five years to life in prison.

In the instant petition, Petitioner does not challenge the validity of his conviction; rather, he claims the Board of Parole Hearings' (Board) November 29, 2007 decision finding him unsuitable because it was not supported by some evidence.

///

///

---

[1] This information is derived from the state court documents attached to Respondent's answer, which are not subject to dispute.

1

Petitioner challenged the Board's 2007 decision by way of Petition For Writ of Habeas Corpus in the San Joaquin County Superior Court. The superior court denied the Petition in a reasoned decision.

Petitioner then filed a habeas petition in the California Court of Appeal, which was summarily denied. Petitioner filed a Petition For Review in the California Supreme Court. The petition was summarily denied.

Petitioner filed the instant Petition For Writ Of Habeas Corpus in this Court on July 2, 2009. Respondent filed an answer to the petition on June 15, 2010, and Petitioner filed a traverse on July 6, 2010.

## STATEMENT OF FACTS

In March of 1992, Petitioner approached Robert Breedlove and offered him cash to kill Petitioner's stepfather, Luis Coelho. Petitioner approached Breedlove on several more occasions and made the same request and then asked if Breedlove knew of someone who would comply.

Petitioner later made a comment to John and Jimmy Vargo that he wished his stepfather were dead. On two occasions, when John and Jimmy were visiting with Petitioner at his home, Theresa Coelho, Petitioner's mother, came outside to speak to Petitioner. Petitioner then told the brothers that his mother would pay them $40,000 and give them each a vehicle if they would kill her husband. The Vargo brothers introduced Lamar Richardson to Petitioner.

Approximately a month before the commitment offense, Petitioner and Jimmy Vargo were driving around a residential neighborhood in Stockton in Petitioner's Corvette. Vargo told Petitioner to pull over to the curb where Richardson was standing. Petitioner wanted Richardson to steal a Corvette so that he could use parts from it to fix up his own Corvette. During this encounter, Petitioner discussed the subject of Richardson murdering Luis Coelho. Petitioner and Richardson discussed the murder on other occasions as well.

On April 3, 1992, at approximately 2:00 p.m., Petitioner drove to Stockton to pick up Richardson, and the two returned to Petitioner's home in Tracy. Brandon Ramos arrived and the three of them drove to the home of Timothy Eggeres to collected money owed to Ramos. They then stopped to pick up marijuana and returned to Petitioner's home.

1       Theresa Coelho put some of the marijuana into soup and an omelet which she was
2 making for Luis Coelho's dinner. When Luis returned from the store, Theresa handed him a
3 Trazadone pill-an anti-depressant-which he took before he ate his food.
4       At 7:30 p.m., Breedlove and Doug Vigil went to Petitioner's home in Tracy to discuss the
5 sale of Petitioner's Corvette. Luis Coelho answered the door and Petitioner went outside. As
6 Breedlove and Vigil were leaving the area, Petitioner told them "we are going to take care of it
7 tonight."
8       Angela Kendrix, Petitioner's girlfriend and mother of their child, normally spent the
9 weekends at Petitioner's residence. At 5:00 p.m., that evening Petitioner telephoned Kendrix and
10 told her he was tired and had company so he would not be picking her up that evening. Kendrix
11 telephoned Petitioner at 10:00 p.m. And she could hear the voice of Brandon Ramos and another
12 unidentified male.
13       Shortly thereafter, Ramos left for Sacramento and Richardson and Petitioner drove to
14 Richardson's home in Stockton. Richardson obtained a long, dark bag which contained
15 handcuffs. They then drove to Video Scene in Stockton and briefly talked to Valerie Means,
16 Richardson's girlfriend. Petitioner and Richardson then went to eat at Burger King and returned
17 to Petitioner's residence.
18       Luis Coelho was sleeping on the living room floor, when Richardson attacked him with
19 an aluminum baseball bat and Petitioner placed handcuffs on Coelho's wrists. Petitioner and
20 Richardson placed Coelho in the trunk of the victim's 1978 Nova. Richardson drove the vehicle
21 out of town and Petitioner followed in a Ford Escort. Richardson ultimately parked in Alameda
22 County, and opened the trunk and repeatedly stabbed the victim with an eight inch kitchen knife.
23 He then removed the handcuffs, left the car keys in the trunk of the car and got into the passenger
24 side of the car driven by Petitioner.
25       The two drove away and threw the knife from the vehicle. The knife was later located by
26 a Sheriff's deputy. When the two returned to Petitioner's residence, Theresa Coelho gave
27 Richardson $32,500 in cash. After taking the cash, Petitioner drove Richardson back to his home
28 in Stockton.

Richardson met with Valerie Means at approximately 5:30 a.m., and they went to Denny's Restaurant for breakfast. Richardson purchased $2,500 worth of appliances at Circuit City for his mother, and later purchased a $9,000 car and paid for it with cash.

On April 4, 1992, at 6:10 p.m., a Sheriff's deputy discovered the Nova with the victim in the trunk. The victim was laying face down, and his pants were down to his ankles and his pockets were empty. Officers observed two blunt injuries to his head and stab wounds on his upper shoulder and neck. His wrists had marks consistent with binding.

At approximately 8:00 p.m., Theresa Coelho reported her husband missing. She told authorities that her husband went fishing at 3:00 a.m. and had not returned home.

An autopsy of the victim was conducted on April 5, 1992. The victim suffered a fractured skull, seven stab wounds to the left shoulder area and neck and contusions and lacerations to the face, and a laceration to the right lung caused hemothorax. The cause of death was reported as "multiple blunt trauma in sides and stab wounds."

Telephone calls from witnesses and relatives alerted the Sheriff's Department that the victim's death may have been the result of murder for hire. During the investigation, there were several discrepancies in the statements made by Petitioner and his mother. One of the discrepancies was the statement that Kendriz was present on the evening of April 3, 1992.

Officers also learned that Theresa Coelho's former husband had mysteriously died, and that she had recently borrowed $10,000 from a relative and purchased an insurance policy on the victim in excess of a million dollars.

When officers later arrested Petitioner and interviewed him, he named Lamar Richardson as the murderer. Richardson later pled guilty to the first degree murder of Luis Coelho. During a preliminary hearing, he testified that Theresa Coelho paid him $3,000 for the murder and claimed he was not the driver of Coelho's vehicle. Richardson was later charged with perjury under oath.

## DISCUSSION

I.  Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

4

enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

Petitioner is in custody of the California Department of Corrections and Rehabilitation pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), *citing* White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging [her] underlying state court conviction.'").

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. ///

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

II.   Review of Petition

There is no independent right to parole under the United States Constitution; rather, the right exists and is created by the substantive state law which defines the parole scheme. Hayward v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen, 482 U.S. 369, 371 (1987); Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (citing Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010). "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause." Bd. of Pardons v. Allen, 482 U.S. at 371.

In California, the Board of Parole Hearings' determination of whether an inmate is suitable for parole is controlled by the following regulations:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.
>
> (b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b). Section 2402(c) sets forth circumstances tending to

demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

> (1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
>
>> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
>> (C) The victim was abused, defiled or mutilated during or after the offense.
>> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
>> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.'
>
> (4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.
>
> (5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.
>
> (6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

Section 2402(d) sets forth the circumstances tending to show suitability which include:

> (1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
>
> (2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.
>
> (3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.
>
> (4) Motivation for Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.
>
> (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

7

    (6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

    (7) Age.  The prisoner's present age reduces the probability of recidivism.

    (8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

    (9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

Cal. Code Regs. tit. 15, § 2402(d)(1)-(9).

The California parole scheme entitles the prisoner to a parole hearing and various procedural guarantees and rights before, at, and after the hearing. Cal. Penal Code § 3041.5.  If denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute. Id.  In addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5.  The denial of parole must also be supported by "some evidence," but review of the Board's or Governor's decision is extremely deferential.  In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

Because California's statutory parole scheme guarantees that prisoners will not be denied parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals recently held California law creates a liberty interest in parole that may be enforced under the Due Process Clause.  Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d at 609.  Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state court's application of the some evidence rule was unreasonable or was based on an unreasonable determination of the facts in light of the evidence.  Hayward v. Marshall. 603 F.3d at 563; Pearson v. Muntz, 606 F.3d at 608.

The applicable California standard "is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings." In re Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted).  As to the circumstances of the commitment offense, the Lawrence Court concluded that

    although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of current

8

> dangerousness to the public unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public safety.

Id. at 1214.

In addition, "the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the central issue of *current* dangerousness when considered in light of the full record before the Board or the Governor.'" Cooke v. Solis, 606 F.3d at 1214 (emphasis in original) (citing Hayward v. Marshall, 603 F.3d at 560).

A. Last Reasoned State Court Decision

In the last reasoned state court decision of the San Joaquin County Superior Court, the petition was denied based on the following:

> In summarizing the reasons for its decision, the panel noted several factors that weighed against a finding of parole suitability. These included the commitment offense - including the fact that it was a murder carried out in a very calculated and brutal manner; petitioner's prior record which demonstrates an escalating pattern of conduct and a failure to profit from previous attempts to correct his criminality; a psychological report which was not totally supportive of release; and his weak parole plans. In addition in determining that the denial should be for three years, the panel found that petitioner was less than forthcoming at his hearing and had a tendency to minimize his role in, and responsibility for, the murder.
>
> The panel's decision need only be supported by "some evidence." [*In re Rosenkrantz* (2002) 29 Cal.4th 616, 625; 128 Cal.Rptr.2d 104, 59 P.3d 174.] There is ample evidence in the hearing transcript to support the panel's conclusion that petitioner poses a current risk to public safety if released. [*In re Lawrence* (2008) 44 Cal.4th 1181, 190 P.3d 535, 82 Cal.Rptr.3d 169; *In re Shaputis* (2008) 44 Cal.4th 1241, 190 P.2d 573, 82 Cal.Rptr.3d 213.]

(Ex. R, to Pet.)

B.     2007 Board Hearing

At Petitioner's *initial* parole consideration hearing in 2007, the Board found him unsuitable based mainly on the heinous nature of the commitment offense, prior criminal history, including assaultive behavior and an escalating pattern of criminal conduct, and psychological evaluation diagnosing Petitioner with adult anti-social behavior.  As discussed in full below, the superior court's decision finding some evidence to support the Board's decision that Petitioner is currently a danger to public safety is not an reasonable application of the "some evidence" standard, nor an unreasonable determination of the facts in light of the evidence.

The commitment offense was very callous and carried out in a very calculated and brutal manner.  At the request of his mother, Petitioner solicited someone to murder his step-father for pay.  Richardson agreed to the murder and he and Petitioner developed a plan to carry it out.  The victim was first drugged by Petitioner's mother, then when he was asleep on the floor he was beaten repeatedly with an aluminum baseball bat to a bloody mess.  He was then handcuffed and thrown in the trunk of his vehicle.  The victim was then driven to a secluded area and stabbed several times with a kitchen knife and abandoned.  The victim was not discovered until the next day.  He suffered a fractured skull and seven fatal stab wounds.

The California Supreme Court has held that "[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." In re Rosenkrantz, 29 Cal.4th 616, 682 (2002).  However, in cases where prisoners have served their suggested base terms and have demonstrated strong evidence of rehabilitation and no other evidence of current dangerousness, the underlying circumstances of the commitment offense alone rarely will provide a valid basis for denying parole.  In re Lawrence, 44 Cal.4th 1191, 1211 (2008).  In this case, at the time of the 2007 hearing, Petitioner had only served 14 years of his 25 years to life sentence, and this was his initial parole consideration hearing.  Morever, there were reasons other than the underlying commitment offense for the Board's denial, and the Board could base its denial on the offense alone as probative of current dangerousness.

1    In addition to the commitment offense, Petitioner suffered prior convictions, including
2 violence against others and had an escalating pattern of criminal conduct.  At the age of 13, he
3 suffered a juvenile conviction for possession of marijuana for sale.  He was later convicted for
4 petty theft.  He was then charged with assault with a deadly weapon.  As an adult, he was
5 convicted of burglary-approximately four months prior to the commitment offense.  This was
6 properly considered by the Board and superior court as one factor in support of unsuitability.  See
7 Cal. Code Regs. tit. 15, § 2402(c)(2) (one factor that supports unsuitability is if "[t]he prisoner on
8 previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the
9 prisoner demonstrated serious assaultive behavior at an early age.").

10    Furthermore, Dr. Kuekes' psychological report was not totally supportive of release.  Dr.
11 Keukes diagnosed Petitioner with adolescent anti-social behavior, as well as adult anti-social
12 behavior under Axis I.  In addition, Petitioner's "overall risk to return in a non-violent manner
13 falls within the moderate range while his risk of perpetrating future violence falls within the
14 upper end of the low range."  Dr. Kueke opined that Petitioner's "risk for non-violent recidivism
15 . . . fall[s] within the high end of the low range."  Petitioner's overall LS/CMI (an actuarial
16 instrument designed to evaluate levels of risk to recidivate) score was in the "moderate" range.
17 Such finding was properly considered by the Board and superior court as a factor in determining
18 whether Petitioner remains a current risk to public safety.  See e.g. Hayward, 603 F.3d at 563
19 (psychologist's evaluation that prisoner posed a "low to moderate" risk of future violence,
20 coupled with evidence that offense was particularly aggravated, is sufficient evidence to
21 demonstrate future dangerousness to support denial of parole.)

22    After considering the factors in support of suitability, the Board concluded that the
23 positive factors did not outweigh the factors in support of unsuitability, and the superior court's
24 determination that the circumstances of the commitment offense, prior criminal history, and
25 unfavorable psychological evaluation demonstrate Petitioner continues to remain an
26 unreasonable risk to public safety is not an unreasonable application of the some evidence
27 standard, nor an unreasonable determination of the facts in light of the evidence.  28 U.S.C. §
28 2254(d).

Petitioner contends that the Board's denial was based on an illegal gubernatorial policy against granting parole for inmates convicted of murder and the Board fails to make individualized considerations in each case. Petitioner has not submitted any credible proof of the existence of such an illegal policy. Nor has he demonstrated that the alleged "no parole" policy played a part in the Board's decision in this case. Moreover, as discussed *supra*, the Board's decision in this case was based on an individualized review of Petitioner's record and there was "some evidence" to support the decision. Accordingly, there is no merit to Petitioner's claim.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **September 20, 2010**          /s/ **Dennis L. Beck**
                                       UNITED STATES MAGISTRATE JUDGE